### COUNTY OF SAN DIEGO, Plaintiff–Appellant,

v.

### CALIFORNIA SPECIAL EDUCATION HEARING OFFICE; Grossmont Union High School District, Defendants–Appellees,

### Rosalind Fox, Counter–Defendant–Appellee.

### No. 94–55557.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 20, 1995.

Decided Aug. 30, 1996.

---

Ian Fan, Deputy County Counsel, San Diego, California, for plaintiff-appellant.

Barry A. Zolotar, California State Department of Education, Sacramento, California, for defendant-appellee, California Special Education Hearing Office.

Sharon Seay, Littler, Mendelson, Fastiff, Tichy & Mathiason, San Diego, California, for defendant-appellee Grossmont Union High School.

Charles Wolfinger, San Diego, California, for counter-defendant-appellee Rosalind Fox.

Before POOLE and O'SCANNLAIN, Circuit Judges; MARSH,* District Judge.

* The Honorable Malcolm F. Marsh, United States District Judge for the District of Oregon, sitting by designation.

O'SCANNLAIN, Circuit Judge:

We must decide whether, under the Individuals with Disabilities Education Act, a California county is entitled to challenge both the state's classification of a minor as seriously emotionally disturbed and its finding ordering residential treatment for which the county is financially responsible.

I

■ Enacted by Congress in 1975 as the Education of the Handicapped Act, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, was renamed in 1990. Its primary objective is "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C. § 1400(c). To accomplish this goal, the statute "provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures." *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1469 (9th Cir.1993).

■ Among the substantive procedures is the development of an individualized education program ("IEP") for each child with a disability. 20 U.S.C. § 1401(a)(18)(D). Crafted annually by the child's teacher, her parents, a representative of the school district, and, where appropriate, the child, the IEP ensures that the child's education is tailored to her individual needs. *Sacramento City Unified Sch. Dist. v. Rachel H.,* 14 F.3d 1398, 1400 n. 2 (9th Cir.1994).

California state law also has a regulatory scheme for special education with the express intent of assuring that all individuals with exceptional needs receive their rights to appropriate programs and services under the IDEA. Cal. Educ.Code § 56000. An "individual with exceptional needs" is defined as a person who meets the age requirements, has been identified by an IEP team as "handicapped," whose impairment requires instruc-

tion or services which cannot be provided with modification of the regular school program and who meets eligibility criteria set forth by regulation. Cal. Educ.Code § 56026.

The state eligibility criteria are set forth at 5 Cal.Code of Regulations ("CCR") Article 3.1. By regulation, the IEP team decides whether the degree of a child's impairment qualifies that child for special education. 5 CCR § 33030. Two types of impairments relevant to this case are seriously emotionally disturbed ("SED"), 5 CCR § 3030(i), and specific learning disabilities, 5 CCR § 3030(j).

■ When a child has been determined to be SED, and residential treatment is recommended, a representative of the County's mental health department is added to the IEP team. Cal. Gov't Code § 7572.5(a). The IEP team is then required to determine whether "[t]he child's needs can reasonably be met through any combination of nonresidential services, preventing the need for out-of-home care," or whether "[r]esidential care is necessary for the child to benefit from educational services." Cal. Gov't Code §§ 7572.5(b)(1)-(2). To measure whether a child benefits from the current educational services she receives, the IEP team determines whether there is progress toward the central goals and objectives of the IEP. *Taylor v. Honig*, 910 F.2d 627, 629 (9th Cir.1990). If residential care is selected, the child or her parents are not liable for the cost of such placement. Cal. Welf. & Inst.Code § 18350(d). Instead, the County's welfare department is responsible for the costs of treatment following residential placement. *Id.* § 18351(a). Thus, the County's interest is two-fold: to provide mental health services to children found to be SED and to pay for residential treatment when necessary.

The IDEA also contains numerous procedural safeguards. Parents or guardians of a disabled child must be notified of any proposed change in the identification, evaluation, or educational placement of the child. 20 U.S.C. § 1415(b)(1)(C). Parents must also be provided an opportunity to present a com-plaint "with respect to any matter" relating to the proposed change. 20 U.S.C. § 1415(b)(1)(E). Upon the presentation of such a complaint, the parent or guardian is entitled to an impartial due process administrative hearing. 20 U.S.C. § 1415(b)(2).

Any party aggrieved by the findings and a final decision has the right to bring a civil action in state or federal court. 20 U.S.C. § 1415(e)(2). "[T]he civil action [ ] may concern 'any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education of such child.'" *Board of Education v. Rowley*, 458 U.S. 176, 204–05, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982) (quoting 20 U.S.C. § 1415(b)(1)(E)). The court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

With this background on the application of IDEA to SED children, we now turn to the resolution of the dispute before us.

## II

During the relevant circumstances of this action, Rosalind Fox was a troubled student with a long history of educational and emotional problems. In 1988–89 and 1989–90, Rosalind attended Emerald Junior High School in Cajon Valley Union Elementary School District. In January 1990, at the beginning of the second semester of Rosalind's eighth grade year, her mother, Paula Tanner, hospitalized Rosalind in the psychiatric unit of Mesa Vista Hospital for violent outbursts related to preparing a school science report. Rosalind's frustration with the assignment led her physically to abuse her mother and to break windows in the family's home. The hospital's diagnosis, prepared by psychiatrist Dr. Allan H. Rabin, was intermittent explosive disorder and dysthymia.[1]

Shortly after her release from Mesa Vista, where she spent part of her time in a day treatment program, Rosalind was found

1. Dysthymia is defined as morbid anxiety and depression accompanied by obsession.

learning handicapped—and, thus, eligible for special education—by the Cajon Valley Union Elementary School District. During the remainder of her eighth grade year at Emerald, Rosalind was assigned little or no homework because it was regarded as too stressful for her. In June 1990, San Diego County Mental Health found Rosalind eligible for AB 3632 services [2] and began providing her with outpatient psychotherapy.

During the summer of 1990, Rosalind transferred to Valhalla High School in Grossmont Union High School District, where she attended a special day class. In July, she was classified as SED on the basis of an inability to learn which cannot be explained by intellectual, sensory or health factors, and inappropriate types of behaviors or feelings under normal circumstances. School records dated October 1990, indicate that while Rosalind made some progress in outpatient therapy, she sought to avoid the therapy sessions. In January 1991, she took her mother's fiance's company car on a joyride. The following month she stole her mother's ATM card and spent $700. By March, she was on a behavior contract at school.

In April 1991, San Diego County Mental Health recommended a day treatment placement for Rosalind but none was immediately available. The IEP team then changed Rosalind's placement temporarily to Homestead, an isolated campus for SED students. The AB 3632 documents from this period include a treatment plan identifying Rosalind's problems as anger, low self-esteem, academic performance anxiety, and low frustration level for academic work. Treatment goals included decreased inappropriate behavior such as lying, stealing, and truancy; improved self-concept and social self-esteem; and increased ability to handle academic work. Rosalind was truant two or three times during her three-month stay at Homestead.

In June 1991, the IEP team changed Rosalind's placement to Frontier ADT Center ("Frontier"), an adolescent day treatment facility located on the same campus as Homestead. Rosalind began attending Frontier in July. Her day there consisted of academic classes during the morning and various modes of therapy during the afternoon. Rosalind's conduct during classes was generally satisfactory, but she refused to participate actively in therapy. She was truant several times while attending Frontier and, on three occasions, had to be taken to the school bus against her will by her parents.

In early August, Rosalind was arrested with a friend from Valhalla High School for shoplifting ten items from a Target store. Despite having been arrested with the merchandise, Rosalind insisted on her innocence, although she eventually acknowledged responsibility to a therapist at Frontier. The therapist assigned Rosalind the task of writing an essay related to her shoplifting. At home during this period, Rosalind threw tantrums over therapy assignments. She broke windows, threw objects around the house, pushed and tripped her younger sister, and threatened to burn the house down. On September 3, 1991, during a confrontation over the shoplifting event and related writing assignments, Rosalind physically attacked her mother, punching and kicking her. Tanner filed criminal charges against Rosalind and had her readmitted to Mesa Vista Hospital. The discharge summary from Mesa Vista, dated September 20, 1991, recommended an out-of-home placement.

Having concluded that the day treatment program at Frontier provided Rosalind with an inadequate public education under the IDEA, Tanner—acting unilaterally and at her own expense—placed her daughter in Project Oz residential treatment center on September 20, 1991. Rosalind remained there until October 14, 1991, when she was transferred to Oak Glen residential facility. Her stay at Oak Glen lasted until June 10, 1992.

Upon placing Rosalind in the first residential center, Tanner requested a hearing regarding the propriety of residential placement before the California Special Education Hearing Office ("the Hearing Office") pursuant to 20 U.S.C. § 1415(b)(2) (parent entitled

---

**2.** AB 3632 is the name of the program which sets forth interagency responsibilities for providing services to handicapped children. *See* Cal. Gov't Code § 7570 et seq.

to due process hearing regarding placement or provision of free appropriate education of child). She opted for the AB 3632 route, which began with mediation on the issue of placement. At the mediation, Tanner identified the issue to be resolved at the hearing as whether Rosalind required residential placement by the County to benefit from an educational program. Although the County also tried to raise the issue of whether the SED determination was correct, the mediator refused, explaining that only the petitioner was permitted to raise issues on the Statement of Issues section of the mediation form.

After an unsuccessful mediation, a due process hearing was held December 19 and 20, 1991. The County again attempted to raise the issue of Rosalind's SED eligibility at the hearing; the hearing officer refused to hear the issue, reasoning that the issue was not before him.

In a decision dated February 20, 1992, the hearing officer concluded that Rosalind required residential placement for educational purposes. After reviewing the administrative record and oral testimony, the hearing officer stated that "it was necessary to determine whether the day treatment program offered ... at the Frontier Adolescent Day Treatment Center provided sufficient therapeutic support to allow [Rosalind] to benefit educationally from instruction." To make this determination, the hearing officer concluded that the April 1991 mental health plan should have been included as part of Rosalind's IEP. He then found that "[t]here is simply no evidence to establish that [Rosalind] made any progress toward the goals in her IEP or mental health treatment plan at Frontier." Thus, according to the hearing officer, Frontier did not provide Rosalind "with sufficient service to enable her to benefit educationally." Therefore, the hearing officer concluded that residential placement was required.

The County then filed this action on March 23, 1992, pursuant to the provisions of 20 U.S.C. § 1415(e)(2). An amended complaint was filed a year later. The named defendants were Tanner (on behalf of Rosalind), the Grossmont Union High School District, and various state defendants, purportedly on behalf of the state hearing officer. Later, the parties filed cross-motions for summary judgment on the issue of whether the County could challenge Rosalind's SED status. After a hearing, the district court denied the County's motion and granted partial summary judgment for defendants. The district court reasoned that neither federal nor California law provides the County with the right to challenge Rosalind's SED status, and that the exclusion of that issue at the state hearing was therefore correct.

After trial on the administrative record and at the conclusion of argument, the court issued an oral decision in favor of the defendants and against the County, followed by a memorandum decision. After the issue of attorney's fees was resolved, judgment was entered on February 23, 1994, and the County timely appealed.

### III

We must first determine whether the district court erred in ruling that the County is not entitled to challenge Rosalind's classification as a seriously emotionally disturbed student. The County contends that it is entitled to challenge her SED classification pursuant to the IDEA's judicial review provision in section 1415(e)(2) and the legislative history of the statute generally. Because it was not given an opportunity to challenge Rosalind's classification as SED, the County asks that this case be remanded to the district court to consider the merits of its SED claim.

In support, the County relies primarily on the language of section 1415(e)(2), which states:

> Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court

of the United States without regard to the amount in controversy.

There is no question that the County is a "party aggrieved" by the SED decision of the hearing officer. The issue is whether the County's challenge regarding the SED determination is a matter related to the original complaint. The County maintains that Tanner's original complaint involved Rosalind's placement, and that the question of her status is a matter related to that placement because it will determine which entity is financially liable.

The procedural safeguards established by the IDEA were expressly intended to benefit the parents or guardians of the student who has allegedly been denied a free appropriate education. Subsections (a) and (b)(1)-(2) of section 1415 outline the rights of parents and guardians. While there is no indication that such safeguards were intended to protect the rights of departments such as the county mental health agency, neither is there any principled reason upon the basis of which the County should be excluded.

Nevertheless, section 1415(e)(2) must be read in conjunction with section 1415(b)(2). Section 1415(e)(2) only gives the County the right to sue Rosalind for what she and her mother contest against it at an administrative hearing. The scope of the administrative hearing mandated by section 1415(b)(2) is limited to the "complaint" raised to obtain the hearing.

The County looks beyond the statutory language on "what" issues may be raised, contending that the legislative history implies that "the right to bring a civil action with respect to the complaint" includes "the original complaint and matters related thereto." The County then cites Supreme Court and Ninth Circuit cases holding that "the civil action 'may concern any matter relating to the identification, evaluation, or educational placement of the child.'" *Rowley,* 458 U.S. at 204–05, 102 S.Ct. at 3050; *Hacienda La Puente Sch. Dist. of L.A. v. Honig,* 976 F.2d 487, 491 (9th Cir.1992).

The phrase "any matter relating to" might be construed to permit a broad array of issues. However, the judicial review provision cannot expand a party's rights beyond what may be raised at the hearing. The limiting phrase "with respect to a complaint presented pursuant by this section" allows the County to contest against Rosalind only what Rosalind may raise against it in an administrative hearing. Because Rosalind's complaint at the administrative hearing addressed only the right to residential placement, we conclude that the County is precluded from challenging the SED determination.

More compelling than the federal law limiting jurisdiction to issues raised in the administrative complaint is the California law conferring upon the school district the sole authority to make the SED assessment. The IDEA allows the state the discretion to decide who makes eligibility decisions. California law permits only school districts to determine a student's eligibility for special education. Cal. Educ.Code §§ 56301–56327. California expressly limits the right of a county mental health agency to participate in an IEP meeting only after some member of a school district IEP team recommends residential placement for a student with a serious emotional disturbance, and then only for determining the scope of mental health services. Cal. Gov't.Code § 7572.5. Although the expanded IEP team does review the SED assessment after the county mental health representative is added, its review is simply a step in determining the necessity for, and type of, residential treatment. Had the state intended the county mental health agency to be entitled to challenge the determination, it would have required the agency's participation at an earlier point in the process. We cannot overrule California's legislative decision to exclude county mental health agencies from the SED assessment by allowing the County indirectly to challenge the SED determination.

The County and the dissent argue that the residential placement decision is inextricably intertwined with the SED determination. While it is true that no residential placement decision need be made if a child is not assessed as SED, it does not follow that the two determinations are indistinguishable. The residential placement decision prescribed by the California statute addresses

whether, given the child's needs as SED, residential care is necessary and available. *Id.* It is conceptually and practically distinct from evaluation of a child as SED.

The dissent argues further that, absent Tanner's self-help in removing Rosalind from Frontier, the County would have participated in the SED decision-making process. A careful look at the California statute, however, reveals that the County would only have been involved *after* the SED assessment was made. Cal. Gov't.Code § 7572.5(a). As discussed above, California only allows the County to participate in the residential placement decision, not the SED assessment.

When read in the context of the entire section, subsection (e)(2) of section 1415 does not appear to permit an agency to contest a student's SED status. State law also appears to preclude the involvement of the County in SED assessments. Accordingly, the district court properly held that the County is not entitled to challenge SED eligibility determinations.

### IV

We must next determine whether the district court erred in upholding the state educational agency's finding that residential placement was appropriate for Rosalind. There is no dispute that the County has standing to raise this issue.

■ Parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of the state or local school officials, do so at their own financial risk. *Florence County Sch. Dist. 4 v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). They are entitled to reimbursement only if a federal court concludes both (1) that the public placement violated the IDEA, and (2) that the private school placement was proper under the Act. *Id.* This issue turns on whether the private residential placement was necessary because the County's day treatment program did not implement the goals in Rosalind's IEP.

### A

■ The court reviews *de novo* the appropriateness of a special education place-

ment under the IDEA. *Ojai*, 4 F.3d at 1471. "Nevertheless, when reviewing state administrative decisions, 'courts must give due weight to judgments of education policy[.]'" *Id.* at 1472 (citation omitted). "Therefore, the IDEA does not empower courts to 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (citation omitted). Rather, "'the [c]ourt in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.'" *Id.* at 1473–74 (citation omitted). "Despite their discretion to reject the administrative findings after carefully considering them, however, courts are not permitted simply to 'ignore the administrative findings.'" *Id.* at 1474 (citation omitted). At bottom, the court itself is free to determine independently how much weight to give the administrative findings in light of the enumerated factors. *Id.* at 1476.

### B

■ The County contends that the district court erred in upholding the State's decision finding residential placement necessary for Rosalind's education. The County argues specifically that the district court erred both in concluding that the hearing officer's decision was entitled to substantial deference and in finding that his decision was supported by a preponderance of the evidence.

The district court reasoned that the hearing officer's finding that Rosalind required residential placement was entitled to substantial weight based on: (1) the detail and sensitivity of the hearing officer's decision; and (2) the decision of the parties not to offer additional evidence. The County's contention that neither of these grounds is supportable is unpersuasive. This circuit gives the state hearing officer's decision "substantial weight" when it "evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented." *Ojai*, 4 F.3d at

1476. Here, the state hearing officer's analysis was intensive and comprehensive. He ruled against the County, finding a preponderance of evidence showing that the day treatment program had not implemented the goals of Rosalind's IEP and that residential placement was necessary. Thus, his decision is entitled to substantial weight.

■ The County also argues that the court should give no special weight to the hearing officer's determination because the hearing officer applied the incorrect standard. The County contends that the appropriate standard is whether the placement was "reasonably calculated to provide the child with educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051. Again, we are unpersuaded. The state agency's decision applied the correct standard: whether the placement implemented Rosalind's major IEP goals. As stated by the district court's memorandum decision:

> For purposes of the IDEA, "[t]he term 'free appropriate public education' is defined to include 'special education' and 'related services.'" *Taylor v. Honig*, 910 F.2d 627, 629 (9th Cir.1990) (citation omitted). "'Related services' in turn are defined by statute as … such developmental, corrective, and other supportive services … as may be required to assist a handicapped child to benefit from special education. …" *Id.* Because Rosalind required mental health counseling to accomplish her IEP goals, the Hearing Officer correctly measured the effectiveness of Frontier's counseling in determining the appropriateness of the Frontier program as a whole.

We agree.

### C

■ The next issue is whether a preponderance of evidence in the record shows that the day treatment program produced no real progress toward the central goals of Rosalind's IEP.

### 1

The State found that Rosalind did not receive an educational benefit from the day treatment because there was no progress on her mental health goals. The district court agreed.

The state agency decision articulates the standards for measuring educational benefit under the IDEA. First, educational benefit is not limited to academic needs, but includes the social and emotional needs that affect academic progress, school behavior, and socialization. Second, in any particular case, the student's IEP defines what goals are relevant in providing the measure of whether a student is getting an educational benefit in the placement.

The state decision then applied these standards. First, it identified the relevant IEP goals and concluded that the mental health treatment plan goals are part of the IEP. Second, it conducted a "review of the facts to determine whether Rosalind derived any educational benefit from the program at Frontier." It noted that the day treatment program "has had little effect, if any, on helping Rosalind control her anger, reduce her tendency to truancy, or diminish her frustration over academic work. In addition, Rosalind remains resistant to psychotherapy." Finally, the report rejected the County's claims of academic progress based on the undemanding schedule.

### 2

The County maintains that Frontier met Rosalind's needs. Citing Rosalind's acquisition of credit for her academic program, the County insists that the school district's placement at Frontier was "reasonably calculated to provide Rosalind with educational benefits … in light of her learning disabilities." We are persuaded, however, that the County erroneously characterizes Rosalind's problems and goals.

■ As stated above, the correct standard for measuring educational benefit under the IDEA is not merely whether the placement is "reasonably calculated to provide the child with educational benefits," but rather, whether the child makes progress toward the goals set forth in her IEP. The language of the standard asserted by the County encourages an interpretation of "educational bene-

fits" that is too limited. The placement must also include "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley,* 458 U.S. at 189, 102 S.Ct. at 3042.

Moreover, Rosalind had been designated as an SED student, not merely one who has learning disabilities. Accordingly, her goals are not limited to academic benefits, but also include behavioral and emotional growth. The hearing officer as well as the district court properly found that the school failed to enable Rosalind to meet her goals as established in her IEP, and therefore that the placement violated IDEA.

### D

The County argues that the day treatment at Frontier was the "least restrictive environment" available as required by the IDEA and Cal. Gov't Code § 7572.5(b)(1). While every effort is to be made to place a student in the least restrictive environment, it must be the least restrictive environment which also meets the child's IEP goals. The hearing officer's decision specifically notes that "[w]hen day treatment fails ... a residential treatment program appears singularly appropriate."

The hearing officer's decision also addresses the question of financial responsibility when both educational and noneducational issues compel residential placement. When confronted with the necessity for residential placement where the need involves a mixture of educational and noneducational concerns, the courts have struggled to develop tests to determine when the special education system is responsible for the costs of the placement. In *Clovis Unified School District v. California Office of Administrative Hearings,* 903 F.2d 635 (9th Cir.1990), this circuit identified three possible tests for determining when to impose responsibility for residential placements on the special education system: (1) where the placement is "supportive" of the pupil's education; (2) where medical, social or emotional problems that require residential placement are intertwined with educational problems; and (3)

when the placement is primarily to aid the student to benefit from special education. *Id.* at 643. The hearing officer applied all three tests to the present case and found that Rosalind's placement at the residential facility satisfied all three.

First, the placement is "supportive" of her education in that it provides the structure, discipline, and support she needs to achieve her IEP and mental health goals. Second, Rosalind's difficulties clearly include substantial educational problems that are related to noneducational problems. Finally, Rosalind's primary problems are educationally related. Therefore, her primary therapeutic need is educational and the primary purpose of her residential placement is educational. Thus, Rosalind satisfies all three tests entitling her to residential treatment provided by the County.

Because Frontier did not meet Rosalind's IEP goals, her placement at Project Oz and Oak Glen residential treatment centers was appropriate. Given all of the evidence of failure in the day treatment program, the County cannot show by a preponderance of the evidence that a residential placement was unnecessary for Rosalind to accomplish her IEP goals.

### E

Pursuant to 20 U.S.C. § 1415(e)(4)(B), "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party." Rosalind, as the prevailing party is entitled to attorney's fees for this appeal. *See Ash v. Lake Oswego Sch. Dist.,* 980 F.2d 585, 590 (1992) (citing *Barlow–Gresham Union High Sch. Dist. No. 2 v. Mitchell,* 940 F.2d 1280, 1286 (9th Cir.1991)).

### V

We affirm the district court's decision which barred the County from contesting Rosalind's SED status and found residential placement appropriate for her education. The case is remanded to the district court for determination of a reasonable fee award.

AFFIRMED.

MARSH, District Judge, dissenting:

I respectfully dissent. While the majority acknowledges that there is no "principled reason upon the basis of which the County should be excluded" from the SED classification process, its holding conflicts with that acknowledgment. There is no question that the County is an aggrieved party within the meaning of the statute. The issue is whether an aggrieved party may raise an issue not raised by the parent in her civil action.

I cannot agree that the phrase "any matter relating to" a complaint as set forth in 20 U.S.C. § 1415(b)(1)(E) is one of limitation. "Any matter" suggests that it encompasses both direct and indirect issues raised with a complaint. Such a liberal construction is consistent with due process protections in that the County clearly has a financial interest in the outcome of the proceeding. This is particularly so where the statute is capable of more than one reasonable interpretation, as is the case here. A broader construction is appropriate where prohibiting the County from raising this issue results in a deprivation of rights arising from the county's interest. More importantly, however, restricting this right fails to recognize two critical factual elements present in this case. First, SED status and placement are inextricably intertwined. It is inconceivable that responsible mental/educational agencies could be expected to compartmentalize these two designations since the child's individual needs and special abilities are precisely the factors that decide the issue of placement. To limit the County to raising only the placement issue would impose an impractical legal fiction on an extremely delicate and complex fact specific process. Even if the county's concern is considered collateral to the issue raised by the parent, I see no benefit achieved by such a topical restriction.

Second, but for the parent's unilateral use of self-help to remove the child, establish a placement and then file a complaint, the County would have participated in the SED decision-making process under state law. California law provides that when the IEP team determines that a child is SED and recommends residential placement, the IEP team "shall be expanded to include a repre-

sentative of the county mental health department." Cal. Govt.Code § 7572.5. After the County is added, the team "shall review the assessment" and then determine whether the child's needs may best be met through residential, non-residential, or a combination of services. § 7572.5(b). By using self-help, the parent effectively bypassed the County's right to participate in the review of the SED determination. Had the IEP team recommended residential placement prior to Fox's self-help, the County would have had the opportunity under California law to not only participate in the decision to place the child in residential treatment, but also to review the child's SED assessment. California, by bringing the County into the IEP process for this purpose, has acknowledged that the SED assessment and residential placement are related matters.

Although the IDEA clearly recognizes that parents have the right to take such action, the statute otherwise encourages parental/state cooperation. The result reached by the majority frustrates the cooperation so intended by Congress.

Based on the foregoing, I would find that the County has the right to challenge SED status under terms of the federal statute and under California law.