**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ASHLAND SCHOOL DISTRICT,
          *Plaintiff-Appellee,*

v.

PARENTS OF STUDENT R.J.,
          *Defendant-Appellant.*

No. 08-35937

D.C. No.
1:07-cv-03012-PA

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, District Judge, Presiding

Argued and Submitted
October 8, 2009—Portland, Oregon

Filed December 7, 2009

Before: Diarmuid F. O'Scannlain and N. Randy Smith,
Circuit Judges, and Ronald M. Whyte,* District Judge.

Opinion by Judge O'Scannlain

---

*The Honorable Ronald M. Whyte, United States District Judge for the
Northern District of California, sitting by designation.

15975

## COUNSEL

Mary E. Broadhurst, of Eugene, Oregon, argued the cause for the defendant-appellant and filed the briefs.

Nancy J. Hungerford, of the Hungerford Law Firm, LLP, Oregon City, Oregon, argued the cause for the plaintiff-appellee and filed the brief. Andrea L. Hungerford, of the Hungerford Law Firm, LLP, was also on the brief.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the district court abused its discretion by denying reimbursement for private-school tuition to the parents of a student eligible for services under the Individuals with Disabilities Education Act.

I

A

R.J. was born in 1989 and adopted by her parents at the age of four-and-a-half. As a second grader in Saginaw, Michigan, R.J. was diagnosed with attention deficit hyperactivity disorder ("ADHD").

In 2001, R.J. and her parents moved to Ashland, Oregon, where R.J. enrolled in the Ashland School District ("ASD"). A school psychologist noted that R.J. had been diagnosed with ADHD, and that she "appear[ed] to present a profile typical of a child with deficits in the control of attention." After concluding that R.J. was eligible for services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, ASD established an individualized education program ("IEP") for R.J. with her parents' approval.

In 2003, R.J. repeated the eighth grade because her mother believed she lacked the maturity for high school. In December of that year, R.J.'s IEP team, which included her parents and representatives from ASD, developed a new IEP. The new IEP identified R.J.'s disability as ADHD, and noted that she had "difficulty with distractibility in the classroom," namely, with "completing tasks, working independently, and organizing assignments." It explained that although R.J. "receives A's and B's when she completes her assignments and turns them in on time," she "consistently struggles to complete many of her assignments and as a result earns C's and D's." To address R.J.'s needs, the new IEP called for specially designed instruction and counseling support.

R.J.'s IEP team met again in April 2004 to plan her transition to high school. R.J. entered the ninth grade the following fall. As a freshman, she began meeting with a counselor at school, with whom she discussed her parents' divorce, which had recently become final. She also began dating T., another student at the high school, who allegedly forced her to have sex with him. Around this time, R.J. started showing signs of depression.

In November 2004, R.J. was reevaluated by the school psychologist, who concluded that while R.J. did have some "inattentive behaviors," ADHD was not having "a significant impact . . . on [her] classroom performance." At a meeting the following month, R.J.'s IEP team decided to renew her existing IEP, with only minor changes. R.J. finished the fall semester with one A, three B's, and two D's on her report card.

In January 2005, R.J. stayed late one night at the home of a custodian who worked at the high school. After R.J.'s mother complained to school officials, ASD reassigned the custodian to the night shift and demanded that he have no further contact with R.J. In the weeks that followed, R.J. told her counselor that her parents were upset about the incident, and

another student saw R.J. harming herself by sticking safety pins in her arm. A psychiatric nurse practitioner diagnosed R.J. with adjustment disorder, and R.J.'s mother requested a reevaluation of R.J.'s IEP.

In February 2005, R.J.'s parents decided to keep R.J. at home until they learned more about her mental condition. ASD provided R.J. with home tutoring, and she continued to meet weekly with her counselor. The counselor explored R.J.'s urges to harm herself, and concluded that they were triggered by her anger toward her ex-boyfriend and frustration about her parents' divorce. After a few weeks of home tutoring, her mother determined that R.J. was ready to return to school. By early March, R.J. was back at school half-time, and by the end of the month, she was attending school again full-time. R.J. finished her freshman year with two B's and three F's.

During the summer of 2005, R.J. snuck out of the house several times to see male friends, including T. When school resumed in the fall, she told her counselor that T. abused her emotionally and physically. She also said that she was attracted to the custodian at the school, and that her mother feared she would move in with him as soon as she turned eighteen.

In late September 2005, R.J.'s mother advised ASD that she was considering placing R.J. in a more restrictive program. ASD agreed to hold a meeting about R.J.'s IEP in October. At the meeting, two of R.J.'s teachers reported on her progress in class. Her English teacher said that R.J. had not turned in all her assignments, but that she had earned "A's and an occasional B" on the ones she had completed. Her social studies teacher described her participation in class as "frequent and positive," and said that her current grade was a "solid" B.

After the teachers spoke, R.J.'s mother expressed concern about R.J.'s "emotional issues." She said:

> I just think that there are some serious emotional issues that are going on here that are affecting her interaction with peers and her interaction with parents and her interaction with teachers. Going behind people's backs, not being trustworthy. Lying about things that are supposed to be done and not done or whatever. . . . She lies about things that have happened to her and gets kids in trouble. . . . And I really am worried about her. She's expressed some really risky, risky behaviors. Extremely risky behaviors including the custodian.

Although R.J. insisted that she was "making better friends," her mother said that she did not "honestly believe" that R.J. had "stopped seeing [T.] or stopped associating with [the custodian]." According to her mother, R.J. was "defiant" at home, and there would be "no option" but to "put her in a residential facility" if such behavior continued.

ASD's director of student services attempted to respond to R.J.'s mother's concerns. "[W]hat I'm really hearing," he said, "is that classes are going well and [R.J. is] not getting in to trouble during the school day. . . . Where [she is] getting in trouble is when [she] sneak[s] out at night and make[s] some poor choices." Emphasizing that "by-and-large school is successful," he recommended that R.J.'s mother look into "classes and resources . . . in the community in terms of learning how to really set limits at home." At the end of the meeting, the IEP team decided to keep R.J.'s existing IEP in place, with a new behavior plan.

In November 2005, R.J.'s mother learned that R.J. was still sneaking out of the house to meet friends. Her mother sent her to live with her father, and R.J. later told one of her teachers that her mother was considering "sending her away" to a private residential facility. The day after Thanksgiving, R.J.'s mother formally notified ASD of her plans to remove R.J. from public school in December and place her at Mount

Bachelor Academy, a private residential facility in central Oregon.

ASD held another IEP meeting on December 9, but R.J.'s parents did not attend. Representatives from ASD "agreed that overall [R.J.] was successful in her present placement and did not need a special class or special school to address issues of work completion, tardiness or trustworthy behavior." In an effort to accommodate the concerns of R.J.'s parents, ASD revised R.J.'s IEP to provide for specially designed instruction on social communication.

Notwithstanding the revised IEP, R.J.'s parents proceeded to withdraw their daughter from ASD and enroll her at Mount Bachelor, effective December 12. R.J. had a "difficult" time at Mount Bachelor and was "dropped a graduating peer group" for falling behind in her classes. In August 2006, she was expelled for having sex with another student. According to her exit summary, "[R.J.] left [Mount Bachelor] with very similar behaviors as she enrolled."

Thereafter, R.J's parents enrolled R.J. at Copper Canyon Academy, a "more restrictive, clinical, all girls" private residential facility in Arizona operated by the same company in charge of Mount Bachelor. At Copper Canyon, R.J.'s treatment plan included individual and group psychotherapy to address matters such as her low self-esteem, her sexual "acting out," and her relationships with family members.

B

R.J.'s parents sought reimbursement for private-school tuition on the ground that ASD failed to give R.J. a "free appropriate public education" ("FAPE"), as required by the IDEA, 20 U.S.C. § 1412(a)(1)(A). In May 2006, they requested an impartial due process hearing conducted by the Oregon Superintendent of Public Instruction.

In December 2006, a state hearing officer granted R.J.'s parents partial reimbursement. The hearing officer determined that ASD violated various procedural requirements of the IDEA between 2003 and 2005, and therefore failed to make a FAPE available to R.J. Even so, the hearing officer reasoned, R.J.'s parents were entitled to tuition reimbursement only if R.J.'s private-school placement was appropriate. According to the hearing officer, Copper Canyon was an appropriate placement, but Mount Bachelor was not. The hearing officer thus granted R.J.'s parents reimbursement under the IDEA only for tuition at Copper Canyon.

ASD brought an action in federal district court under 20 U.S.C. § 1415(i)(2), seeking review of the state hearing officer's decision. Reviewing the decision de novo, while giving the hearing officer's determinations "due weight," the district court rejected the conclusion that ASD failed to provide R.J. a FAPE. The court also rejected the conclusion that Copper Canyon was an appropriate private-school placement for R.J. In the court's view, placement in a residential facility was not "necessary to meet R.J.'s *educational* needs." "Rather," the court determined, "her placement stemmed from issues apart from the learning process, which manifested themselves away from school grounds." The court found that R.J. did not require a residential placement "for any educational reason." Accordingly, the court held that R.J.'s parents were not entitled to reimbursement under the IDEA for private-school tuition at Copper Canyon. R.J.'s parents appeal.

II

R.J.'s parents contend that the district court applied the wrong standard of review to the state hearing officer's decision. They argue that the district court should have reviewed the hearing officer's findings of fact for clear error, and his grant of reimbursement for abuse of discretion. We disagree.

[1] In any action brought under 20 U.S.C. § 1415(i)(2), the court "(i) shall receive the records of the [state] administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). We have construed section 1415(i)(2)(C) as calling for de novo review of the state hearing officer's findings and conclusions. *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996). At the same time, section 1415(i)(2)(C)'s mandate that "the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *see B.S.*, 82 F.3d at 1499. Thus, the court "must give deference to the state hearing officer's findings, particularly when . . . they are thorough and careful," *B.S.*, 82 F.3d at 1499, and avoid "substitut[ing] [its] own notions of sound educational policy for those of the school authorities which [it] review[s]," *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) (internal quotation marks omitted). In the end, however, the court is free to determine independently how much weight to give the state hearing officer's determinations. *See County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996); *Ash v. Lake Oswego Sch. Dist., No. 7J*, 980 F.2d 585, 587-88 (9th Cir. 1992).

[2] Here, the district court reviewed the state hearing officer's decision de novo, while giving his determinations "due weight." We are satisfied that the district court applied the proper standard of review. Contrary to the assertion of R.J.'s parents, the district court was not required to review the hearing officer's findings only for clear error and his grant of reimbursement only for abuse of discretion.

## III

[3] R.J.'s parents also challenge the district court's denial of reimbursement for private-school tuition at Copper Canyon. The IDEA authorizes the court to "grant such relief as

[it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Although "[t]he ordinary meaning of these words confers broad discretion on the court," *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985), the circumstances in which parents may be reimbursed for private-school tuition are limited. *In Burlington*, *id.*, the Supreme Court "held that courts may grant reimbursement under § 1415(i)(2)(C)(iii) only when a school district fails to provide a FAPE *and* the private-school placement is appropriate." *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2493 n.9 (2009); *see also Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12-13, 15 (1993). "The latter requirement is essential to ensuring that reimbursement awards are granted only when such relief furthers the purposes of the Act." *T.A.*, 129 S. Ct. at 2493 n.9.

**[4]** Where, as here, the private-school placement is a residential facility, the placement is appropriate only if it is " 'necessary to provide special education and related services.' " *B.S.*, 82 F.3d at 1500 (quoting 34 C.F.R. § 300.302 (1996) (since recodified at 34 C.F.R. § 300.104 (2009))). The requirement that the residential placement be necessary furthers the IDEA's purposes of assuring that "children with disabilities, including children in . . . private institutions . . ., are educated with children who are not disabled," and that "separate schooling . . . occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). Whether a residential placement is necessary to provide special education and related services—that is, whether the "student is incapable of deriving educational benefit outside of a residential placement"—is ultimately a question of fact, which we review for clear error. *B.S.*, 82 F.3d at 1499.

R.J.'s parents challenge the district court's finding that R.J.'s placement at Copper Canyon was not necessary on two grounds. First, they contend that the district court committed

an error of law by interpreting "special education" and "related services" too narrowly under the IDEA. According to R.J.'s parents, this error prevented the district court from appreciating the full extent of R.J.'s needs and thus the necessity of a residential placement. Reviewing the district court's interpretation of the IDEA de novo, we reject the parents' contention.

[5] Under the IDEA, "special education" means "specially designed *instruction* . . . to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29) (emphasis added). "Related services" means "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability *to benefit from special education*." *Id.* § 1401(26) (emphasis added). Given these statutory definitions, the district court properly focused on whether "placement in a residential facility was necessary to meet R.J.'s *educational* needs." As we explained in *Clovis Unified School District v. California Office of Administrative Hearings*, 903 F.2d 635 (9th Cir. 1990), "our analysis must focus on whether [the residential] placement may be considered necessary for *educational* purposes." *Id.* at 643 (emphasis added). If "the placement is a response to medical, social, or emotional problems . . . quite apart from the learning process," then it cannot be considered necessary under the IDEA. *Id.* The district court did not err by undertaking such analysis.

[6] Second, R.J.'s parents argue that the district court clearly erred in finding that R.J.'s placement at Copper Canyon was not necessary to provide special education and related services. Substantial evidence, however, supports the district court's finding that R.J. did not require a residential placement "for any educational reason." Although R.J.'s teachers reported that she had difficulty turning in assignments on time, the record shows that she earned good grades when she managed to complete her work. The record also shows that it was R.J.'s "risky behaviors" outside of school that prompted her parents to enroll her first at Mount Bachelor

and then at Copper Canyon. The concerns expressed by R.J.'s mother at the October 2005 IEP meeting, for example, revolved almost entirely around R.J.'s "defiant" behavior at home, including her dishonesty about her relationships with T. and the custodian. Moreover, her parents' decision to place her at a residential facility was precipitated by their discovery that she was still sneaking out of the house to see friends. Thus, despite testimony by representatives from Copper Canyon that R.J. was incapable of succeeding academically outside of the residential facility, the district court did not clearly err in finding that R.J.'s placement there "stemmed from issues apart from the learning process, which manifested themselves away from school grounds."

*County of San Diego v. California Special Education Hearing Office*, 93 F.3d 1458 (9th Cir. 1996), is not to the contrary. The student in that case was "hospitalized . . . for violent outbursts related to preparing a school science report," *id.* at 1462, and "was assigned little or no homework because it was regarded as too stressful for her," *id.* at 1463. Noting that the student's "primary problems [were] educationally related," we affirmed the district court's finding that a residential placement was necessary. *Id.* at 1468. Here, by contrast, the district court found that "R.J. was not disruptive in class. She was well regarded by her teachers, able to learn in regular classes, and capable of benefitting from the education provided to her by the school. It was mostly her behavior away from school that was at issue." Substantial evidence supports these findings, which establish that R.J.'s primary problems were not educationally related.

**[7]** We therefore conclude that the district court did not clearly err in finding that R.J.'s residential placement at Copper Canyon was not necessary to provide special education and related services. Because "courts may grant reimbursement under § 1415(i)(2)(C)(iii) only when . . . the private-school placement is appropriate," *T.A.*, 129 S. Ct. at 2493 n.9,

the district court did not abuse its discretion in denying R.J.'s parents reimbursement for tuition at Copper Canyon.[1]

## IV

For these reasons, the judgment of the district court is

**AFFIRMED.**

---

[1]Because we affirm the district court's determination that R.J.'s private-school placement was not appropriate, we need not decide whether ASD provided R.J. a FAPE.