**B.V., Individually and as guardian ad litem of J–C.V., an incompetent minor, Plaintiff,**

v.

**DEPARTMENT OF EDUCATION, STATE OF HAWAIʻI, Defendant.**

**Civil No. 05–00116 JMS.**

United States District Court, D. Hawaiʻi.

Dec. 19, 2005.

---

Carl M. Varady, Honolulu, HI, for Plaintiff.

Aaron H. Schulaner, Holly T. Shikada, Department of the Attorney General, Honolulu, HI, for Defendant.

*ORDER DENYING PLAINTIFF'S MOTION TO REVERSE HEARING OFFICER'S DECISION AND ORDER*

SEABRIGHT, District Judge.

## I. *INTRODUCTION*

Plaintiff B.V., individually and as guardian ad litem for her minor son, J–C.V. ("J–C"), seeks reversal of the administrative Hearing Officer's decision regarding the education of her son. The Hearing Officer concluded that the State of Hawai'i Department of Education ("DOE") had complied with the requirements of the Individuals with Disabilities Act ("IDEA") by providing J–C with a Free Appropriate Public Education ("FAPE"). The Hearing Officer's decision, issued January 25, 2005, thus denied the Plaintiff's request for tuition reimbursement. The Plaintiff appeals this ruling, arguing that the Individualized Education Plan ("IEP") offered by the DOE does not satisfy the IDEA's requirements. The Plaintiff seeks reimbursement for tuition she has paid for her son's education at Loveland Academy, a private school in Hawaii, as well as attorney's fees.

The court concludes that the IEP offered by the DOE provided J–C with a FAPE. Therefore, the court DENIES the Plaintiff's motion.

## II. *BACKGROUND*

### A. *Legal Background: The IDEA*

In 1975, Congress passed what is now known as the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., in response to a finding that more than half of the nation's eight million children with disabilities were not receiving appropriate educational services. *Porter v. Board of Trustees of Manhattan Beach,* 307 F.3d 1064, 1066 (9th Cir.2002). Pursuant to the act, known then as the Education of All Handicapped Children Act ("EHA"), Congress appropriated federal funds for state special education programs and made them available on the condition that states implement policies assuring for all children with disabilities a "free appropriate public education," or "FAPE." *Id.*; 20 U.S.C. § 1412(a) (establishing right to a free appropriate public education).

*Melodee H. v. Dep't of Educ.,* 374 F.Supp.2d 886, 890–91 (D.Haw.2005). *See also Kletzelman v. Capistrano Unified Sch. Dist.,* 91 F.3d 68, 69 (9th Cir.1996) (stating that the IDEA "confers upon disabled students an enforceable substantive right to public education in participating States, and conditions federal financial assistance upon a State's compliance with substantive and procedural goals of the Act") (citations and internal quotation signals omitted); *Poolaw v. Bishop,* 67 F.3d 830, 834 (9th Cir.1995) ("The IDEA's broad mandate to provide handicapped children with a free appropriate public education designed to meet the unique needs of each handicapped child is fairly imprecise in its mechanics. This vagueness reflects Congress' clear intent to leave educational policy making to state and local education officials.").

FAPE ("free appropriate public education") is defined in 20 U.S.C. § 1401(9) as:

special education[1] and related services[2] that—

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary, or secondary education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

■ The FAPE to which a disabled child is entitled under the IDEA is not the absolute best or "potential-maximizing" education. *Bd. of Educ. of Hendrick Hudson Cent. School Dist. v. Rowley*, 458 U.S. 176, 197 n. 21, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Instead, states are obligated to provide a basic floor of opportunity through a program individually designed to provide educational benefits to the disabled child. *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir.1996); *Ash v. Lake Oswego Sch. Dist.*, 980 F.2d

585, 587 (9th Cir.1992). The "basic floor of opportunity" provided by the IDEA consists of access to specialized instruction and related services. *Seattle Sch. Dist., No. 1*, 82 F.3d at 1500 (quoting *Rowley*, 458 U.S. at 201, 102 S.Ct. 3034). The basic floor, however, is more than merely providing a program that produces some minimal academic advancement, no matter how trivial. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 890 (9th Cir.2001).

■ The FAPE required by the IDEA must be tailored to the unique needs of the disabled child by means of an "IEP." *Rowley*, 458 U.S. at 181, 102 S.Ct. 3034; *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir.1993). An IEP, or Individualized Education Plan, is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(11). *See* 20 U.S.C. § 1414(d)(1)(A) (setting forth specific requirements of IEP); *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1461 (9th Cir.1996) ("Crafted annually by the child's teacher, her par-

---

**1.** "Special education" is currently defined in 20 U.S.C. § 1401(29) as follows:

The term "special education" means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including—
 **(A)** instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
 **(B)** instruction in physical education.
This definition became effective on July 1, 2005. Prior to this date, the initial paragraph referred to "specifically designed instruction," rather than "specially designed instruction."

**2.** "Related services" is defined generally by 20 U.S.C. § 1401(26)(A) as follows:

The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, *interpreting services*, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, *school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child*, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.
(Emphases added.) The emphasized sections were added effective July 1, 2005; the prior version of this definition did not include the emphasized sections but was otherwise identical.

ents, a representative of the school district, and, where appropriate, the child, the IEP ensures that the child's education is tailored to her individual needs.").

Additionally, the IDEA requires states to develop procedures to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a FAPE. 20 U.S.C. § 1415(a). These procedures include an opportunity to present complaints relating to the identification, evaluation, or educational placement of a child, as well as an opportunity to contest the school district's contention that it has provided a FAPE to that child. 20 U.S.C. § 1415(b)(6). When a complaint is made pursuant to § 1415(b)(6), "the parents involved in such complaint shall have an opportunity for an impartial due process hearing." 20 U.S.C. § 1415(f)(1). An aggrieved party can thereafter appeal the hearing officer's determination to a federal district court. 20 U.S.C. § 1415(i)(2)(A).

### B. *Factual Background: J–C*

■ J–C is a fifteen-year-old boy with Asperger's Syndrome.[3] Changes in J–C's routine cause him to become very anxious, and stimuli from his environment can overwhelm him. For example, J–C used to go to the school cafeteria during his lunch hour, but he would become so over-whelmed by the lunchtime activity (the large number of children yelling and running around in one place at one time) that he would get very upset and would not eat. To accommodate him, the school allowed J–C to eat lunch in his regular classroom (a significantly quieter and calmer environment). In February 2002, Catherine Critz, Ph.D., performed a comprehensive developmental evaluation of J–C, indicating that J–C "has serious and significant social difficulties." Administrative Record on Appeal ("ARA") at 151. Dr. Critz also opined that J–C "strikes me as a very high intensity needs child who would benefit far greater from a full time therapeutic aide knowledgeable in Asperger Syndrome." ARA at 155. She stated that "JC's current daily experience sounds very, very fragile and needs intervention immediately." ARA at 154 (emphasis omitted from original).

For the 2002–2003 school year, and part of the 2003–2004 school year, J–C received special education services at Kailua Intermediate School (Kailua). He was placed in a "fully self-contained classroom" with Carey Fuller as his Special Education Teacher. Hearing Officer's Decision at 3. In addition to his teacher, J–C had an Intensive Instructional Services Consultant (IISC), Dr. Sherry Henry, as well as a Skills Trainer.[4]

---

**3.** Asperger's Syndrome is a pervasive developmental disorder that "causes clinically significant impairment in social, occupational, or other important areas of functioning." *Diagnostic and Statistical Manual of the American Psychiatric Association* 69, 80 (4th ed. Text Revision 2000). Asperger's Syndrome is similar to Autism in that "restricted, repetitive patterns of behavior, interests, and activities are present" in both. *Id.*

The court agrees with the Hearing Officer's determination that J–C qualifies for special education services under the IDEA.

**4.** In testimony before the Hearing Officer, Jenny Wells, Ph.D. (a DOE Educational Spe-

cialist for Autism) explained the roles of the Special Education Teacher, the IISC, and the Skills Trainer. The Special Education Teacher approves and oversees the student's educational plan. The IISC acts as a consultant, assisting in developing and implementing the student's plan and providing advice and expertise on issues specific to Asperger's Syndrome. The Skills Trainer, described by Dr. Wells as a "paraprofessional," provides support to the Special Education Teacher. Specifically, the Skills Trainer provides reinforcement when the student is acting appropriately and helps to clarify social settings for the student. Thus, the Skills Trainer follows the directions of the Special Education Teacher

From 2002–2003, J–C appeared to do well at Kailua. William Bolman, M.D. (board certified in child and adolescent psychiatry), has treated J–C since 1996 (when J–C was five years old). Dr. Bolman reported on October 25, 2002, that J–C liked Kailua and that he seemed to be succeeding at the school. Dr. Bolman's report stated that J–C "has an excellent teacher (Carrie Fuller) . . . and a supportive principal. . . . All in all I am very impressed with the school's level and quality of services for JC, and he is responding to these services." ARA at 198. The Skills Trainer at the time, Amie Bush, took initiative with J–C and was receptive to input by Dr. Henry. Ms. Bush left Kailua just before the end of the 2002–2003 school year;[5] she was replaced by Amrit Hamilton, with whom J–C did not appear to have the same kind of rapport. There seems to have been some tension among Ms. Fuller, Dr. Henry, and Ms. Hamilton. According to Dr. Henry, Ms. Hamilton did not have experience with Asperger's Syndrome or Autistic children. Dr. Henry criticized Ms. Hamilton for not spending enough time with JC and for arguing with Dr. Henry regarding J–C's diagnosis as having Asperger's Syndrome. Transcript of Proceedings before Hearing Officer ("Tr.") at 201–03. In October or November 2003, Ms. Hamilton left and Garett Chang (another Skills Trainer from the same agency as Ms. Hamilton) took her place. According to Dr. Henry, the new Skills Trainer also lacked experience with Autistic and Asperger's Syndrome children. Tr. at 218.

According to B.V., J–C became increasingly frustrated and depressed during the 2003–2004 school year. B.V. testified that J–C came home agitated and anxious and that he had nightmares of dying and of blowing up his school. Tr. at 318–20. Dr. Henry testified that J–C's depression advanced to the point where J–C became suicidal.[6] Tr. at 212–14. J–C's depression was apparently caused by a series of small events at school. For example, Dr. Henry had arranged to allow J–C to leave his classroom fifteen minutes before the end of the school day; apparently, J–C had a difficult time at the very end of the school day because of the "heavy stimuli" of children yelling and running around. Tr. at 204. According to Dr. Henry, Ms. Hamilton simply informed Dr. Henry one day that she (Ms. Hamilton) and Ms. Fuller decided that J–C should leave at the same time as everyone else. As another example, at some point Ms. Fuller began to write J–C's name on the board whenever he did something wrong. Tr. at 318. Dr. Bolman indicated that, while the technique of writing a child's name on the board is appropriate for most children, this technique causes "intense anxiety and regression" for Asperger's children. ARA at 196–97.

B.V. requested an emergency IEP meeting, and a meeting was held on November 6, 2003. At the meeting, B.V. requested

---

and IISC to implement behavioral support plans and to provide instructional support if necessary.

In J–C's case, neither the IISC nor the Skills Trainer was a DOE employee; instead, the DOE contracted with outside agencies for these services. Dr. Wells testified that the DOE does not specify the individuals who will provide services; instead, the DOE simply requires that the individuals provided by the contracting agencies will have appropriate training.

**5.** Dr. Bolman's July 18, 2003 report indicated that J–C "really missed" Ms. Bush but that "[a]ll in all I'm pleased with the way that JC continues to mature." ARA at 197.

**6.** As explained *infra*, at no point did Dr. Henry or B.V. inform Ms. Fuller or the DOE of Dr. Henry's belief that J–C had suicidal ideations.

that the DOE hire a Skills Trainer with experience with Asperger's Syndrome; specifically, B.V. requested that a particular Skills Trainer, Jon Connelly, be hired as J–C's Skills Trainer.[7] Dr. Henry had previously made a similar request for a Skills Trainer with particular training and/or experience, and the record suggests that B.V. had made previous requests regarding the Skills Trainer as well.[8] *See* Tr. at 319. Dr. Lorraine Henderson (the Principal at Kailua Intermediate School) wrote B.V. a letter on November 7, 2003, denying B.V.'s request for a different Skills Trainer, stating that "the Department of Education deems that the current Skills Trainer is working acceptably and at this point, there is no need to make changes per the school's measurement of standards." ARA at 405. In her testimony, Ms. Fuller confirmed that B.V. requested a different Skills Trainer at the November 6, 2003 IEP meeting; Ms. Fuller testified that, although the IEP team listened to B.V.'s concerns, B.V. was told that personnel was not an IEP team decision such that staffing matters would not be discussed at the IEP meeting.

J–C's annual IEP review date was December 13, 2003, but the IEP was not conducted until January 8, 2004. B.V. again requested that the school provide a Skills Trainer with Asperger's experience. B.V. testified that, at this meeting, Dr. Wells stated that staffing was not a topic for discussion at the IEP meeting. Tr. at 338; *see also* ARA at 346. At the administrative hearing on January 25, 2005, Dr. Wells explained that "personnel decisions are administrative decisions." Tr. at 140.

At the end of the January 8 meeting, B.V. informed the DOE that she would be enrolling J–C at Loveland Academy. On March 2, 2004, B.V. sent a letter to Kailua indicating that J–C was attending Loveland[9] and that B.V. was requesting reimbursement from the DOE.[10] On March 15, 2004, Dr. Henderson (the Principal at Kailua) sent B.V. a letter stating that Kailua "is able to implement your child's IEP and is able to provide a free and appropriate

---

7. In fact, Mr. Connelly attended this IEP meeting, signing the log-in sheet as a "Guest." ARA at 253. In addition, Dr. Henderson sent B.V. a letter on November 7, 2003, in which she stated that "procuring services with Mr. Connolly [sic] as a Skills Trainer for J.C. would be a conflict of interest." ARA at 405; *see also* Tr. at 331–32.

8. During the November 6, 2003 IEP meeting, B.V. and Dr. Henry requested three other specific changes to J–C's IEP goals: (1) that J–C's individual workload be changed; (2) that J–C be given no homework; and (3) that J–C not be expected to interact with peers for any particular amount of time. ARA at 333. Whether the DOE implemented these changes is not entirely clear. As to items one and two, B.V. testified that the DOE's response was that "JC's workload at school was already modified" but that Ms. Fuller "would try not to have to send home any homework"; according to B.V., however, Ms. Fuller did not say that she would stop giving J–C homework. Tr. at 330. As to item number three, the notes from the IEP meeting suggest that the DOE agreed with B.V. and Dr. Henry. ARA at 333.

9. The record is unclear as to whether the DOE knew that J–C was attending Loveland before March 2, 2004. Although B.V. had informed the DOE at the January 8, 2004 IEP meeting that she would be placing J–C at Loveland, J–C appears to have attended Kailua somewhat sporadically in January and February; furthermore, B.V. and B.V.'s mother repeatedly told Ms. Fuller in January and February that J–C had been absent from Kailua because he was sick. ARA at 406; Tr. at 26–29; Hearing Officer's Decision at 4.

10. By all accounts, J–C is making progress at Loveland. Dr. Bolman's March 19, 2004 report indicates that J–C's "behavior has done a complete turn-around" since Dr. Bolman had last seen him (on July 18, 2003). Furthermore, the Hearing Officer agreed with B.V. that Loveland Academy was an appropriate placement for J–C.

public education. Since you have chosen to enroll your child at Loveland Academy, the placement will be at your own expense." ARA at 408. B.V. sent a bill from Loveland to Kailua, and on April 16, 2004, Dr. Henderson again wrote to B.V. to explain that the DOE would not reimburse B.V. because the placement was unilateral. ARA at 409. Furthermore, Dr. Henderson explained that the DOE would not continue JC's related services (IISC, Skills Trainer, and Medication Monitoring) if J–C remained at Loveland. *Id.*

B.V. filed requests for a hearing with the DOE on April 30, 2004 and July 22, 2004 pursuant to 20 U.S.C. § 1415 and Hawaii Administrative Rules (HAR) Chapter 8–56. The requests for hearings were consolidated, and the hearing took place before Hearing Officer Richard A. Young on November 29 and 30, 2004. The Hearing Officer issued his decision on January 25, 2005. He concluded that the placement at Kailua was appropriate and that the DOE, through the January 8, 2004 IEP, offered J–C a FAPE. The Hearing Officer specifically found that Ms. Fuller was an "outstanding special education teacher." Hearing Officer's Decision at 7. He also found that J–C was making progress at Kailua for the 2002–2003 school year, and further noted that both Ms. Fuller and Dr. Wells believed that J–C was making progress in the 2003–2004 school

year; nevertheless, the Hearing Officer did not make any findings as to whether J–C was, in fact, making progress in the 2003–2004 school year. The Hearing Officer found that "[a]lthough writing Student's name on the blackboard when he engaged in inappropriate behavior does not appear to be appropriate for Student, this alone is not enough to show FAPE was denied." Hearing Officer's Decision at 7.

In sum, the Hearing Officer concluded that there were no procedural or substantive violations of the IDEA, such that B.V. was not entitled to relief.

B.V. filed a timely appeal. She argues that she is entitled to reimbursement of J–C's tuition at Loveland Academy for two reasons: first, she argues that the DOE violated the procedural requirements of the IDEA by failing to respond to her oral requests for skills trainers; second, she argues that the DOE failed to provide J–C with a FAPE. B.V. filed a motion for summary judgment on June 30, 2005,[11] and the court heard counsels' arguments on October 24, 2005.

### III. *STANDARD OF REVIEW*

The IDEA provides that "[a]ny party aggrieved by the findings and decision" of the hearing officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this sec-

---

11. Although B.V.'s motion is labeled as a motion for summary judgment, this label is not entirely accurate:

 [A]lthough the actions before this Court are for "summary judgment," the fact that they are so captioned does not mean that this Court uses its normal summary judgment standard of review in which it examines whether genuine issues of material fact exist. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Ninth Circuit in [*Capistrano Unified School Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995)] explained:

 Our opinion in *Ojai* explores the difficulty of using a summary judgment framework for what amounts to resolution of conflicting evidence on the facts. In that case, as in many under the [IDEA], disputed issues of fact existed. Likewise, in the case at bar, the mixed question of the cause of [the student's] school failure was disputed. Ordinarily summary judgment could not issue, because of the genuine dispute.

*Dep't of Educ., State of Hawaii v. Rodarte ex rel. Chavez,* 127 F.Supp.2d 1103, 1109 (D.Haw.2000) (some alterations in original and some added).

tion, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A).

The IDEA requires the following of the court:

In any action brought under this paragraph, the court—

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party;[12] and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C).[13] In *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court explained the court's role in reviewing an administrative decision in an IDEA case:

[T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e)[14] requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to

these proceedings. And we find nothing in the Act to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself. In short, the statutory authorization to grant "such relief as the court determines is appropriate" cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress.

Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

(Footnotes omitted.) (Final alteration in original.) *See also City of Chi. v. Int'l College of Surgeons,* 522 U.S. 156, 171, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (citing *Rowley* for the proposition that the IDEA "contemplates deferential review of state administrative action").

The Ninth Circuit has clarified the court's role in reviewing a hearing officer's decision in an IDEA case:

The proposition that the courts must give "due weight" raises the question of how *much* weight is "due." We held in *Gregory K. v. Longview Sch. Dist.,* 811

---

**12.** Neither party requested that the court hear additional evidence in this case.

**13.** Prior to July 1, 2005, this particular provision was codified at 20 U.S.C. § 1415(i)(2)(B).

**14.** This provision now appears at 20 U.S.C. § 1415(i).

F.2d 1307, 1311 (9th Cir.1987), that "[h]ow much deference to give state educational agencies ... is a matter for the discretion of the courts." Following a First Circuit decision, we held in *Gregory K.* that the courts are to consider the findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue," but the court "is free to accept or reject the findings in part or in whole." *Id.* (quoting *Town of Burlington v. Department of Education,* 736 F.2d 773, 792 (1st Cir.1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are "thorough and careful." *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1524 (9th Cir.1994). *Capistrano Unified School Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995) (alterations in original).

■■■ Thus, judicial review of IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review. *Ojai,* 4 F.3d at 1471. The IDEA does not empower a court to substitute its own notion of sound educational policy for that of the school authorities that the court reviews. *County of San Diego,* 93 F.3d at 1466; *Ojai,* 4 F.3d at 1472; *Gregory K. v. Longview Sch. Dist.,* 811 F.2d 1307, 1311 (9th Cir.1987). In recognition of the expertise of the administrative agency, the court must consider the findings carefully and endeavor to respond to the hearing offi-

cer's resolution of each material issue. After such consideration, the court is free to accept or reject the finding in whole or in part. *County of San Diego,* 93 F.3d at 1466; *Gregory K.,* 811 F.2d at 1311. Despite its discretion to reject the administrative findings after carefully considering them, a court is not permitted simply to ignore the administrative findings. *County of San Diego,* 93 F.3d at 1466; *Gregory K.,* 811 F.2d at 1311.

■■■ The burden in this proceeding is on B.V., the party challenging the administrative ruling. *Seattle School Dist., No. 1 v. B.S.,* 82 F.3d 1493, 1498 (9th Cir.1996) ("As the party challenging the administrative ruling, the School District ... had the burden of proof in district court.").

## IV. *DISCUSSION*

B.V. argues that the DOE violated J–C's procedural and substantive rights under the IDEA. The court concludes that the DOE offered J–C a FAPE and that the DOE neither violated J–C's substantive rights nor violated his procedural rights.

### A. *The DOE offered to provide J–C with a FAPE*

B.V. argues that, even if the DOE complied with the procedural requirements of the IDEA, the January 8, 2004 IEP did not meet the IDEA's substantive requirements because it was not reasonably calculated to provide an educational benefit to J–C. B.V. contends that the IEP should have considered personnel issues. Specifically, she argues that J–C should have been provided with a Skills Trainer with training or experience working with Autistic children and that the DOE should not have maintained the status quo with respect to Ms. Fuller's role as the Special Education Teacher.[15] The court disagrees

---

**15.** B.V. does not specifically argue that Ms. Fuller should have been replaced, nor does

she argue that Ms. Fuller should have been given additional training. Instead, B.V. sim-

with B.V. and concludes that the DOE offered J–C a FAPE through the January 8, 2004 IEP. The court first addresses B.V.'s concerns with Ms. Fuller and then discusses B.V.'s arguments with respect to the Skills Trainer.

### 1. Ms. Fuller's continued role as J–C's teacher did not deprive J–C of a FAPE

■ The court disagrees with B.V.'s contention that Ms. Fuller made the IEP inadequate. B.V. points out two reasons why Ms. Fuller was not the proper choice to be J–C's Special Education Teacher: (1) Ms. Fuller improperly excluded Dr. Henry from the classroom; and (2) Ms. Fuller wrote J–C's name on the board when he was behaving improperly. As to the first item, the DOE corrected the apparent mistake prior to the January 8, 2004 IEP by noting, in the November 2003 IEP, that Dr. Henry is permitted to be in the classroom with J–C. ARA at 329.

As to the second item, the Hearing Officer acknowledged that Ms. Fuller's strategy of writing J–C's name on the chalkboard was an improper educational tactic, and the court accepts this finding. Nevertheless, the weight of the evidence strongly supports the Hearing Officer's conclusion that Ms. Fuller is "an outstanding special education teacher." Kimberly Fenton (Autism Consultant Teacher with the DOE) testified that Ms. Fuller is "highly competent" at working with Autistic children; Dr. Wells (Educational Specialist for Autism in the Windward District) testified that Ms. Fuller is qualified to implement the IEPs of Autistic students; and, most importantly, J–C was making progress

with Ms. Fuller during the 2002–2003 school year. The Hearing Officer found that Ms. Fuller's "testimony and demeanor at [the] hearing evidenced her abilities as a special education teacher,"[16] and he found Ms. Fuller to be "an outstanding special education teacher" based on testimony from Dr. Bolman and Ms. Fuller's coworkers. Hearing Officer's Decision at 7.

After reviewing the testimony, the court finds that there is compelling evidence that Ms. Fuller is a highly qualified Special Education Teacher and the court accepts the Hearing Officer's finding on this point. The court is unwilling to conclude that one misjudgment on the part of an otherwise outstanding teacher completely undermines an IEP. Thus, the court concludes that Ms. Fuller's continued role as J–C's teacher did not deprive J–C of a FAPE.

### 2. The lack of a Skills Trainer with experience and/or training working with Autistic children did not deprive J–C of a FAPE

■ B.V. presents two interrelated arguments as to why the January 8, 2004 IEP should have required J–C's Skills Trainer to have experience and/or training working with Autistic children: first, she argues that J–C had not made any educational progress during the 2003–2004 school year, such that the DOE should have changed J–C's IEP to provide for a meaningful educational benefit; and second, she contends that J–C was suicidal and needed to work with specific personnel to prevent his mental health from deteriorating. Though the court believes that assigning J–C a Skills Trainer with addi-

---

ply argues that Ms. Fuller acted inappropriately towards J–C and Dr. Henry and that the DOE's decision to keep Ms. Fuller as the Special Education Teacher constituted a denial of FAPE to J–C.

16. The court interprets this statement to mean that Ms. Fuller was a credible witness and that she demonstrated through her testimony and demeanor the traits of a qualified special education teacher. The court defers to the Hearing Officer's finding on this point.

tional training or experience may have benefitted him, a FAPE need not provide the absolute best or "potential–maximizing" education. *Rowley,* 458 U.S. at 197 n. 21, 102 S.Ct. 3034. Although there may be an appropriate case for a federal court to consider the personnel decisions made by the DOE, J–C's IEP was not deficient simply because it failed to prescribe specific qualifications for J–C's Skills Trainer. B.V. asks too much of the IDEA, and the court rejects B.V.'s arguments.

a. *Educational progress during the 2003–2004 school year*

The parties disagree as to whether J–C was "progressing" during the 2003–2004 school year. The January 8, 2004 IEP was substantially similar to the prior IEP; B.V. argues that because J–C was not progressing under the existing IEP, the DOE's attempt to continue with a similar course of action would, by definition, fail to provide J–C with a meaningful educational benefit. In other words, B.V. argues that if J–C had been regressing during the first half of the 2003–2004 school year, the DOE would not have been justified in offering a nearly identical IEP after the January 8, 2004 meeting.

The court recognizes that the basic floor of opportunity to which a disabled child is entitled is more than merely providing a program that produces some minimal academic advancement, no matter how trivial. *Amanda J. v. Clark County Sch. Dist.,* 267 F.3d 877, 890 (9th Cir.2001). Nevertheless, as discussed *supra,* the FAPE to which a disabled child is entitled under the IDEA is not the absolute best or "poten-

tial-maximizing" education. *Seattle Sch. Dist., No. 1 v. B.S.,* 82 F.3d 1493, 1498 (9th Cir.1996). And as *Rowley* explained, Congress did not "invit[e] … the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034.

Although the evidence in this case does not clearly favor either side, the court concludes that J–C was making educational progress during the 2003–2004 school year. Ms. Fuller testified that J–C was making progress in some areas, although she recognized that he was not making progress in other areas. Tr. at 33. She also acknowledged that J–C was regressing in some areas and was "a little bit more anxious" in November and December of 2003, but she did not believe that JC's behavior and performance deteriorated from seventh grade to eighth grade. Tr. at 72, 81. To the contrary, Ms. Fuller testified that J–C would sit down with his peers and play a game in eighth grade, whereas he would not do that in seventh grade. J–C began to see classmates outside of school, which Ms. Fuller described as "very significant." Tr. at 82. The January 13, 2004 Prior Written Notice of Department Action from Dr. Henderson (Kailua Principal) to B.V. also indicated that J–C "is making progress on goals and objectives and there have not been any sudden changes in JC's behavior or performance since his last evaluation." ARA at 382. This evidence supports the Hearing Officer's conclusion that the January 8, 2004 IEP, which was very similar to the IEP already in place,[17] was designed to provide J–C with a meaningful educational benefit.[18]

---

**17.** The record indicates that the January 8, 2004 IEP implemented a few minor changes to the previous IEP, and was therefore not identical to the prior IEP. Tr. at 21, 110.

**18.** Dr. Bolman's March 19, 2004 report also states, "After an IEP that did not help to solve JC's regressed behavior the mom pulled him

out of school and enrolled him in Loveland. Since being there JC's behavior has done a complete turn-around." ARA at 196. The court gives little weight to Dr. Bolman's conclusion that the IEP was insufficient, however, inasmuch as Dr. Bolman had not seen J–C since July 18, 2003 and appears to have gotten his information about the appropriateness

Whether J–C was making educational progress under his old IEP is not the critical inquiry, however. Instead, the court must determine whether the IEP was reasonably calculated to provide J–C with a meaningful educational benefit. As the Ninth Circuit explained:

> Instead of asking whether the [Individualized Family Service Plan (IFSP) [19]] was adequate in light of the [student's] progress, the district court should have asked the more pertinent question of whether the IFSP was appropriately designed and implemented so as to convey [the student] with a meaningful benefit. We do not judge an IFSP in hindsight; rather, we look to the IFSP's goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [the student] with a meaningful benefit.

*Adams v. State of Oregon,* 195 F.3d 1141, 1149 (9th Cir.1999). In other words, the court must examine the IEP prospectively, rather than retrospectively; nevertheless, because the IEP in place prior to January 8, 2004 is substantially similar to the January 8, 2004 IEP, the court concludes that evidence of J–C's progress during the 2003–2004 school year is relevant in determining whether the January 8, 2004 IEP was an offer of a FAPE.

The court concludes that the DOE offered J–C a FAPE. The DOE offered J–C 1825 minutes a week of special education; 270 minutes a quarter of speech language therapy; 600 minutes a week of IISC services; and one-on-one instruction of 1855 minutes a week in school and 360 minutes a week outside of school. This plan provided J–C with a meaningful educational benefit in the past, and Ms. Fuller testified that this plan would continue to provide J–C with a meaningful educational benefit in the future as well. Tr. at 35 ("I strongly believe we were implementing the IEP, and that we could continue to implement his IEP. . . . I do believe that a Free and Appropriate Public Education for JC could be provided at Kailua Intermediate."); Tr. at 22 (stating that some of the goals outlined in the January 8, 2004 IEP "have been changed slightly or completely revised," some of the goals "are completely different," and some of the goals "are continuing from the progress of the previous year"). Therefore, the court agrees with the Hearing Officer that J–C would have received a meaningful educational benefit from the DOE's January 8, 2004 IEP.

J–C's purported lack of educational progress does not appear to be B.V.'s main concern, however. Instead, B.V.'s principal argument is that J–C could not continue attending Kailua because he was becoming increasingly depressed and sui-

---

of J–C's IEP from B.V. (rather than from an independent review of JC's educational progress).

**19.** In *Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal.,* 287 F.3d 1176, 1178 (9th Cir.2002), the Ninth Circuit compared the IEP with the IFSP:

> For each child covered by IDEA, an education program team, consisting of the child's parents, teachers and representatives from the responsible education agency, crafts an annual Individual Education Program ("IEP"). . . . However, when a child is under three years old, an Individualized Family Service Plan ("IFSP") is created instead of an IEP. The IFSP focuses on the infant's developmental needs, as well as requirements of the child's family.

See also *G. ex rel. Ssgt RG v. Fort Bragg Dependent Schools,* 324 F.3d 240, 244 n. 5 (4th Cir.2003) ("An IFSP is a plan of the services to be provided an infant or toddler with a disability and is thus very similar to an IEP. The procedures for development and implementation of an IFSP, as well as the procedural safeguards guaranteeing parents' rights, are likewise very similar to those relating to an IEP." (Citation omitted.)).

cidal. The court now turns to this contention.

### b. *J–C's depression and suicidal ideations*

B.V. argues that an incompetent Skills Trainer caused J–C to become suicidal, such that the January 8, 2004 IEP (which failed to address the Skills Trainer issue) did not constitute an offer of FAPE. If J–C became suicidal as a result of a deficient IEP, and if the DOE knew this and refused to implement changes to J–C's educational program, the court would be extremely reluctant to conclude that Kailua offered J–C a FAPE. The fact that a disabled student obtains a modicum of educational benefit cannot constitute "educational progress" where the educational program causes suicidal tendencies; no parent should have to put a child's life at risk simply because the child continues to learn *something* by attending school.

There is some evidence that J–C was suicidal. Dr. Henry testified that, two grades earlier (in sixth grade), J–C was "clearly suicidal" and was dreaming about blowing up his school. Tr. at 196. Dr. Henry further testified that, in eighth grade (the 2003–2004 school year), J–C was becoming depressed and was beginning to spiral downward in a similar way.

Dr. Henry was the only witness to testify that J–C was depressed and suicidal, however. Although B.V. provided other evidence that J–C was regressing and was becoming increasingly anxious,[20] none of the other witnesses or exhibits provided any indication that J–C had deteriorated in the manner suggested by Dr. Henry. Instead, the January 13, 2004 Prior Written Notice of Department Action written by Dr. Henderson (the Kailua Principal) stated that "there have not been any sudden changes in JC's behavior or performance since his last evaluation." ARA at 382. Similarly, although Ms. Fuller acknowledged that J–C was exhibiting some anxiety at the beginning of his eighth grade year, Ms. Fuller explained that J–C was in a classroom with new classmates and that he always experienced increased anxiety whenever anything in his environment changed. Tr. at 56–57. Again, Ms. Fuller provided no indication that J–C was suicidal. Furthermore, the Skills Trainers' daily logs reflect the fact that J–C had good days and bad days, but they fail to demonstrate an overall pattern of regression and depression suggested by B.V. and Dr. Henry.[21]

Testimony and records from those individuals who saw J–C just after he left Kailua also fail to support B.V.'s contention that J–C was in crisis. Iwalani Campman (J–C's Special Education Teacher at Loveland) testified regarding J–C's behavior when he first started attending Loveland; she testified that J–C was "hesitant to be part of the classroom" and that "[h]e would yell with any tasks assigned to him," but at no time did she provide any indication that he was severely depressed and/or suicidal. Tr. at 293. Likewise, Ann Mary Palozzi, Psy.D., performed a neuropsychological evaluation of J–C on February 25 and March 13 and 20, 2004, and her written report failed to note anything that would indicate that J–C was or had recent-

---

**20.** Specifically, B.V. testified that J–C was coming home "very, very agitated," Tr. at 318, that J–C was "having ... bad thoughts and hearing voices that he couldn't stop," Tr. at 325, and that J–C was having "bout[s] of anxiety and nightmares[.]" Tr. at 327.

**21.** The court recognizes, however, that B.V. contests the Skills Trainers' competence. For that reason, the court does not rely heavily on the Skills Trainers' reports for its conclusions. The court points to these reports as additional evidence weighing against B.V.'s claims, although the court would reach the same conclusion even without these reports.

ly been suffering from the kind of depression suggested by B.V. ARA at 142–150.

In short, there is insufficient evidence to support B.V.'s contention that her son was, in fact, suicidal. B.V. had the burden of proof before the Hearing Examiner, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 537, 163 L.Ed.2d 387 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."), and has the burden of proof on appeal as well, *Seattle School Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir.1996) ("As the party challenging the administrative ruling, the School District ... had the burden of proof in district court."). The court concludes that B.V. has not met her burden to warrant overturning the Hearing Officer's decision or the DOE's decision.[22]

Furthermore, there is no indication that Dr. Henry or B.V. informed the DOE of their belief that J–C was suicidal, nor is there any indication that DOE had any independent reason to believe J–C was suicidal. Although the testimony clearly reflects the fact that B.V. was unhappy with the Skills Trainers provided by the DOE, neither B.V. nor Dr. Henry nor any other witness testified that the DOE was informed that J–C's mental state was deteriorating in the manner suggested by the Plaintiff. The November 2003 IEP, January 2004 IEP, and January 2004 Prior Written Notice all fail to demonstrate that the DOE knew of J–C's alleged suicidal

condition. While the DOE surely has some obligation to heed signs that a student is suicidal, this duty cannot extend so far that the DOE is expected to be omniscient with respect to the mental states of its students. Additionally, the record (particularly Ms. Fuller's testimony) indicates to the court that periods of regression are normal with students like J–C, undercutting B.V.'s argument that the DOE should have known that J–C was suicidal.[23] From the DOE's perspective, J–C was not suicidal and the January 8, 2004 IEP was therefore not deficient.

Whether J–C required a Skills Trainer with training and/or experience working with Asperger's children was a question of educational policy for the DOE, not the court, to decide. The DOE determined that the most appropriate way to offer J–C the services he needed was to provide the following: (1) a skilled Special Education Teacher (with training and experience working with Autistic and Asperger's Syndrome children) in charge of the classroom; (2) an IISC (who also has training and experience working with Autistic and Asperger's Syndrome children); and (3) a Skills Trainer for one-on-one instruction. The DOE does not require the Skills Trainer to have the same training or experience as the Special Education Teacher; instead, the DOE has established a system whereby the Skills Trainer is a paraprofessional who takes direction from the teach-

---

**22.** The court need not and does not find that J–C was not suicidal; the court merely finds that B.V. has not met her burden of proof as to this issue.

**23.** B.V. argues that DOE should have known about J–C's mental status. She points to 20 U.S.C. § 1412 and *Department of Education, State of Hawaii v. Cari Rae S.*, 158 F.Supp.2d 1190 (D.Haw.2001), for the proposition that the DOE has an independent obligation to evaluate its students. This argument is without merit. The "Child Find" provision of

§ 1412 (which provides in relevant part that "[a]ll children with disabilities residing in the State, ... and who are in need of special education and related services, are identified, located, and evaluated") requires the DOE to identify and evaluate those students with disabilities, and *Cari Rae S.* affirms the basic principle that the DOE has an affirmative obligation to identify and evaluate these students. J–C has already been identified and evaluated as a special education student, however, and neither § 1412 nor *Cari Rae S.* requires anything more from the DOE.

er and the IISC. In other words, the DOE has determined that the Skills Trainer need not have extensive experience or training because the Special Education Teacher and IISC have the required training and can direct the Skills Trainer. Tr. at 103. There is no question that this system has provided J–C with a meaningful educational benefit in the past, inasmuch as J–C was making educational progress during the 2002–2003 school year. Thus, the DOE's system is not flawed—the only issue is whether J–C is entitled to a Skills Trainer with additional training and/or experience.

While the court assumes, without deciding, that J–C would have benefitted from having a Skills Trainer with training or experience working with Asperger's children, there is simply not enough evidence for the court to conclude that J–C *must* have such a Skills Trainer, let alone a specific Skills Trainer (such as Mr. Connelly), in order to receive an educational benefit by attending Kailua. If the court were to require that the DOE provide J–C with a Skills Trainer with additional training and/or experience, the court would be substituting its judgment regarding educational policy for that of the DOE. This is not the court's role. If the court were to accept B.V.'s argument, the court would also be undermining the fundamental principle of the IDEA that a disabled child is not entitled to the absolute best or "potential-maximizing" education. While the court can certainly imagine circumstances under which a personnel decision would be of crucial importance to a student, and while this case may approach exactly those circumstances, the court is extremely reluctant to interfere with the DOE's staffing decisions. There is simply insufficient evidence for the court to impose particular restrictions on the DOE in this case.

The court understands and sympathizes with B.V.'s and J–C's predicament in this case. Nevertheless, the court is not authorized to order the DOE to do what may be best for J–C. In this case, the court concludes that the DOE has offered J–C a FAPE, and the court can require nothing more.

B. *The DOE did not violate the procedural requirements of the IDEA*

B.V. alleges four procedural violations of the IDEA. First, she contends that the DOE violated the IDEA by failing to respond to her request for private placement at Loveland. Second, she argues that the DOE failed to respond to her requests for a different Skills Trainer. Third, she argues that the IEP was flawed because the DOE failed to consider input from B.V. Fourth, she argues that the DOE unilaterally cut Dr. Henry's hours.[24] Each of these arguments is without merit.

1. **Request for placement at Loveland**

 B.V. argues that the DOE violated the procedural requirements of the IDEA

---

24. The Plaintiff also suggests a fifth procedural violation, namely that the DOE violated the procedural requirements of the IDEA by failing to hold J–C's IEP in December. Opening Brief at 11. The record indicates, however, that the IEP was originally scheduled for December 4, 2003 (before J–C's annual review date of December 13), but B.V., not the DOE, cancelled the appointment because she could not get time off from work. Tr. at 335. The IEP was rescheduled for mid-December, but that IEP date was also cancelled because Ms. Fuller did not give B.V. notice of the IEP date. Consequently, the IEP was rescheduled for and took place on January 8, 2004. To the extent that the Plaintiff argues that the DOE violated the IDEA by failing to hold J–C's IEP until January of 2004, the court rejects this argument. An emergency IEP meeting was held on November 6, 2003, and B.V., not the DOE, was responsible for the cancellation of the timely scheduled IEP on December 4, 2003. The Plaintiff's brief is disingenuous to the extent it suggests otherwise.

by failing to respond to her January 8, 2004 request for placement at Loveland in writing. She argues that 34 C.F.R. § 300.503 [25] required the DOE to respond to her requests in writing, and she further argues that 20 U.S.C. § 1415 [26] required the DOE to explain, in writing, the reasons for its refusal to act; she contends that because the DOE failed to respond in writing, and because the DOE's failure to place J–C at Loveland deprived him of a meaningful educational opportunity, she and J–C are entitled to relief.

B.V.'s arguments are without merit. On January 8, 2004, B.V. indicated that she was placing J–C at Loveland. Even if the court were to construe this as a request for placement (rather than as a unilateral statement of what B.V. was going to do), the DOE rejected this request, in writing, in the January 13, 2004 Prior Written Notice of Department Action. Specifically, B.V. was told (both during the January 8 IEP meeting and in the Prior Written Notice) that "the decision to place JC in a private school would be a unilateral decision on the part of the parent." ARA at 381. The Prior Written Notice followed the structure of § 1415(c)(1) and included all the information required by that statute. The DOE explained that it was rejecting B.V.'s request for placement at Loveland because "the school could provide FAPE[.]" ARA at 381.

Similarly, on March 2, 2004, B.V. contacted the DOE and requested reimburse-

**25.** 34 C.F.R. § 300.503, entitled "Prior notice by the public agency; content of notice," provides in relevant part:

(a) *Notice.* (1) Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency—

(i) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or

(ii) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

**26.** 20 U.S.C. § 1415 (entitled "Procedural Safeguards") provides in relevant part:

**(b) Types of procedures**
The procedures required by this section shall include—

. . . . .

(3) written prior notice to the parents of the child whenever such agency-
**(A)** proposes to initiate or change; or
**(B)** refuses to initiate or change;
the identification, evaluation, or educational placement of the child, in accordance with subsection (c) of this section, or the provision of a free appropriate public education to the child;

. . . . .

**(c) Content of prior written notice**

The notice required by subsection (b)(3) of this section shall include—
**(1)** a description of the action proposed or refused by the agency;

**(2)** an explanation of why the agency proposes or refuses to take the action;

**(3)** a description of any other options that the agency considered and the reasons why those options were rejected;

**(4)** a description of each evaluation procedure, test, record, or report the agency used as a basis for the proposed or refused action;

**(5)** a description of any other factors that are relevant to the agency's proposal or refusal;

**(6)** a statement that the parents of a child with a disability have protection under the procedural safeguards of this subchapter and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained; and

**(7)** sources for parents to contact to obtain assistance in understanding the provisions of this subchapter.
Section 1415 was amended effective July 1, 2005. The current version of § 1415 is nearly identical: although Congress clarified a few phrases and reorganized § 1415(c)(1) somewhat, the court finds no meaningful distinction between the prior and current versions of this statute as applied to the instant case.

ment for J–C's tuition at Loveland; the DOE again rejected this request, in writing, in Dr. Henderson's March 15, 2004 letter. The DOE had explained its rationale in detail in the January 13, 2004 Prior Written Notice, and the March 15, 2004 letter again explained that "Kailua … is able to implement your child's IEP and is able to provide a [FAPE]." ARA at 408. Thus, the evidence indicates that the DOE *did* respond to B.V.'s requests in writing, and there is nothing to suggest that the DOE violated J–C's or B.V.'s procedural rights.

▮ Furthermore, even if the DOE's notice was technically deficient, B.V. is not entitled to relief. As the Ninth Circuit has explained, " '[p]rocedural flaws do not automatically require a finding of a denial of a FAPE. However, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE.' " *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 645 (9th Cir.2005) (quoting *W.G. v. Board of Trustees of Target Range School Dist. No. 23, Missoula, Mont.*, 960 F.2d 1479, 1484 (9th Cir.1992)) (alteration in original). *See also Amanda J. v. Clark County School Dist.*, 267 F.3d 877, 891 (9th Cir.2001) ("20 U.S.C. § 1415 enumerates the procedural safeguards of the IDEA, the importance of which 'cannot be gainsaid.' " (Quoting *Rowley*, 458 U.S. at 205, 102 S.Ct. 3034.)). After the November 2003 and January 2004 IEP meet-

ings, B.V. was informed that the DOE believed it was offering J–C a FAPE and that the DOE would not place J–C at Loveland. There is no indication that the alleged procedural violation, by itself, caused J–C to lose an educational opportunity: B.V. placed J–C at Loveland in early 2004 knowing that the DOE was unwilling to pay for this placement; thus, even if the DOE's January 13 or March 14 writings failed to comply with the technical requirements of the IDEA or 34 C.F.R. § 300.503, J–C was not denied any educational opportunity. Therefore, B.V. is not entitled to relief.

**2. Requests for Skills Trainer familiar with Asperger's**

▮ B.V. next argues that the DOE failed to respond to her requests for a different Skills Trainer. She alleges that she specifically asked the DOE for a Skills Trainer with experience with Asperger's Syndrome beginning in the Summer of 2003 and that the DOE failed to consider these requests. She again argues that 34 C.F.R. § 300.503 at 20 U.S.C. § 1415 required the DOE to respond to her requests in writing and in detail; she contends that because the DOE failed to respond in writing, and because the DOE's failure to provide J–C with a different Skills Trainer deprived J–C of a meaningful educational opportunity, she and J–C are entitled to relief.

The court finds that B.V. made requests for a Skills Trainer with specific training and/or experience on November 6, 2003, and on January 8, 2004.[27] Nevertheless,

---

27. B.V. states in her brief that she made frequent requests for a different Skills Trainer beginning in February of 2002. The Hearing Officer also stated that, "[o]ver a 2 year period, the Principal did not act on" B.V.'s request for a Skills Trainer with experience working with Asperger's children. Hearing Officer's Decision at 5. There is evidence in the record that B.V. did, in fact, make requests for a different Skills Trainer in February 2002 (as well as in June 2002). Neverthe-

less, the argument section of B.V.'s Opening Brief refers only to those requests made "[b]eginning in the Summer of 2003[.]" Opening Brief at 27. Therefore, the court will only consider the alleged procedural violations made from the summer of 2003 to January 2004. Within this time frame, the court finds that B.V. made requests in November 2003 and January 2004. The court does not find that B.V. made a request *prior* to November 2003, however. In particular, the June 5,

the court concludes that B.V.'s arguments are without merit.

First, as to B.V.'s January 8, 2004 request, the DOE satisfied the requirements of 34 C.F.R. § 300.503 and 20 U.S.C. § 1415 with its January 13, 2004 Prior Written Notice. The Prior Written Notice follows the structure set forth by § 1415 and includes all the required elements. Therefore, the court rejects B.V.'s argument because it lacks factual support.

Second, as to B.V.'s November 6, 2003 request, the DOE satisfied the majority of § 1415's requirements via Dr. Henderson's November 7, 2003 letter. This letter rejected B.V.'s request in writing; explained why it was refusing B.V.'s request ("the [DOE] deems that the current Skills Trainer is working acceptably and at this point, there is no need to make changes per the school's measurement of standards"); considered an alternative (hiring Mr. Connelly as Skills Trainer); and explained why that alternative was rejected (because doing so would present a conflict of interest). ARA at 405. Although the letter failed to include information about B.V.'s procedural rights, and also failed to include resources for B.V. to obtain information about the IDEA, B.V. received this information five months earlier (in the June 5, 2003 Prior Written Notice of Department Action, which covered J–C's educational program during the intersession) and there is no indication that this procedural violation (to the extent one exists) deprived J–C of a meaningful educational benefit. *See, e.g., Roland M. v. Concord School Comm.*, 910 F.2d 983, 994 (1st Cir. 1990) ("Strictness, however, must be tempered by considerations of fairness and practicality: procedural flaws do not automatically render an IEP legally defective.").

 Furthermore, B.V. would not be entitled to relief even if the DOE had committed a procedural error. As discussed *supra,* the DOE offered J–C a FAPE; even if the DOE had failed to comply with the requirements of § 1415, there is no indication that this procedural violation, by itself, denied J–C a meaningful educational benefit. Therefore, the court rejects B.V.'s procedural claim.

### 3. Alleged failure to consider parental input

 B.V. also alleges that the DOE violated IDEA's procedural requirements by failing to consider parental input. This argument is similarly without merit.

B.V. again points to the DOE's failure to provide J–C with a different Skills Trainer as the main example of the DOE's failure to consider parental input in the IEP process. Again, although B.V. may disagree with the DOE's decisions, the DOE officials at the November 6, 2003 and January 8, 2004 IEP meetings discussed B.V.'s concerns and considered her views. Tr. at 21, 106. From a procedural standpoint, the IDEA requires nothing more.

### 4. Alleged cutting of Dr. Henry's hours without prior written notice

 B.V. argues that the DOE violated the IDEA by unilaterally cutting Dr. Henry's hours in the fall of 2003 without consulting with or notifying B.V. prior to taking this action. The DOE corrected the

---

2003 Prior Written Notice of Department Action stated that J–C would have "[s]kills training for 5 hours a week during intersession" and that the "[t]eam agreed that this would best meet JC's needs and reduce regression in his behaviors and social skills." ARA at 380. This document, along with the lack of clear testimony from either Dr. Henry or B.V. as to a specific request made between June 2003 and November 2003 for a Skills Trainer with particular training or experience, leads the court to find and conclude that the only two requests at issue are those in November 2003 and January 2004.

apparent mistake prior to the January 8, 2004 IEP by noting, in the November 2003 IEP, that the IISC hours would continue at ten hours per week. ARA at 329. Thus, there is no indication that this alleged procedural violation deprived J–C of a meaningful educational benefit.

## V. *CONCLUSION*

Based on the foregoing, the court DENIES the Plaintiff's motion. As this order disposes of all outstanding matters in this case, the clerk of the court is instructed to enter judgment in favor of the defendant and close the case file.

IT IS SO ORDERED.